Dear Ms. Susanne Brogan
On behalf of the Economic Development Article Review Committee, you have asked that we address four questions related to several regional development agencies established in the Annotated Code of Maryland. The laws governing each of these agencies provides that, upon "dissolution" of the agency, its assets are to be distributed to organizations exempt from federal taxation under § 501(c)(3) of the Internal Revenue Code and that any assets not distributed in that manner shall be disposed of by the circuit court. You note that bill review letters of this Office have concluded that the requirement that a court dispose of the assets of a dissolved agency assigns a nonjudicial duty to a court in violation of Article 8 of the Maryland Declaration of Rights. You then ask the following questions, which we have reordered slightly:
1. May a regional development agency dissolve without the enactment of legislation to repeal its statutory charter?
2. If the answer to Question 1 is "no," how could the statutory provision requiring disposition of agency assets to a § 501(c)(3) organization take effect? And, if it cannot take effect, may the entire dissolution provision properly be repealed in a nonsubstantive revision of the agency's statute?
3. Because of the constitutional issues surrounding the assignment of a nonjudicial duty to a court in distributing assets of a dissolving regional development agency, may the provisions assigning that duty to a court properly be repealed in a nonsubstantive revision?
4. Are the funds of a regional development agency "State funds," resulting in a possible conflict with Annotated Code of Maryland, State Finance Procurement Article ("SFP"), § 7-302, or other relevant provisions?
The answers to your questions are as follows:
1. A regional development agency may not dissolve or otherwise be terminated without legislative action by the General Assembly.
2. A statutory provision requiring disposition of agency assets to § 501(c)(3) organizations could be given effect if the Legislature amends the agency's enabling law to set a termination date for the agency, but otherwise leaves that law, including the provision concerning disposition of agency assets, in effect. Of course, as part of its decision to terminate an agency, the General Assembly could also choose to dispose of the agency's assets in some other way. In our opinion, the provision concerning disposition of assets to § 501(c)(3) organizations should not be repealed in a non-substantive revision of the code.
3. Although the part of the existing law that assigns to the circuit court the duty of distributing assets of a terminated agency raises a constitutional issue, that law can be construed in a constitutional manner to provide for judicial disposition of the assets, if the court's jurisdiction is invoked through an interpleader or other appropriate action. Accordingly, that provision should not be repealed in a nonsubstantive revision of the code.
4. While SFP § 7-302 states a general rule that unspent agency appropriations revert to the State's general fund, the General Assembly may specify other dispositions of State funds by statute. The disposition of some funds held by regional development agencies may also be subject to conditions set by a grantor, such as the federal government.
I
Background
A. Special Development Agencies
Your inquiry concerns six special development agencies created by the Legislature and codified in the Annotated Code of Maryland: the Tri-County Council for Southern Maryland (Article 20); the Tri-County Council for Western Maryland (Article 20A); the Tri-County Council for the Lower Eastern Shore of Maryland (Article 20B); the Mid-Shore Regional Council (Article 20C); the Upper Shore Regional Council (Article 20D); and the Rural Maryland Council (Article 41, § 15-101 et seq.).
Each of the five regional councils has been created as a "tax-exempt public body corporate and politic." Article 20, § 1-103(a); Article 20A, § 1-103(a); Article 20B, § 1-103(a); Article 20C, § 1-103(a); Article 20D, § 1-103(a). Each serves as a "cooperative planning and development agency within [its] area to foster . . . physical, economic, and social development . . . ." Id. Each regional council is designated as an "independent unit" that may not be placed in any department of State government. Article 20, § 1-106; Article 20A, § 1-106; Article 20B, § 1-107; Article 20C, § 1-107; Article 20D, § 1-107. Some of the regional councils have also been assigned additional functions. See Article 20, § 4-101 et seq. (creation and oversight of consumer affairs board for Southern Maryland); Article 20A, § 4-101 et seq. (Western Maryland Regional Tourism Board).
The five regional councils are each jointly financed by the State and the counties that comprise the particular region.[1] Each agency may also receive funding from the federal government, as well as from "other public and private sources." Article 20, § 2-403(b); Article 20A, § 2-205(b); Article 20B, § 2-301(b); Article 20C, § 2-301(b); Article 20D, § 2-301(b).
The Rural Maryland Council was created to satisfy a prerequisite for the State's participation in the National Rural Development Partnership sponsored by the federal government. Chapter 119, Preamble, Laws of Maryland 1995. It is open to membership by any citizen of Maryland "who has an interest in improving the quality of life in rural Maryland." Article 41, §§ 15-102, 15-103. It is also an "independent unit in the Executive Branch of State government," and is placed under the State Department of Agriculture for budget and administrative purposes. Article 41, § 15-107. It is funded through an appropriation in the State budget. Article 41, § 15-107(c). It may also accept grants, as well as other forms of assistance, from the federal government, local governments, and private sources. Article 41, § 15-108.
B. Dissolution Provision
The enabling law for each of the five regional development agencies and the Rural Maryland Council includes a dissolution provision similar to the following:
Upon the dissolution of the Council, the Council, after paying or making provision for the payment of all of the liabilities of the Council, shall dispose of all of the assets of the Council exclusively for the purposes of the Council in such manner, or to such organization or organizations organized and operated exclusively for charitable, educational, religious, or scientific purposes as at the time shall qualify as an exempt organization or organizations under § 501(c)(3) of the Internal Revenue Code . . . as the Council determines.
Article 20, § 1-103(b) (Tri-County Council for Southern Maryland). The statute goes on to provide:
Any such assets not so disposed of shall be disposed of by the circuit court for the county in which the principal office of the Council is located, exclusively for such purposes or to such organization or organizations, as the court determines, which are organized and operated exclusively for such purposes.
Id. (emphasis added); see also Article 20A, § 1-103(b); Article 20B, § 1-103(b); Article 20C, § 1-103(b); Article 20D, § 1-103(b); Article 41, § 15-110.[2]
C. Possible Unconstitutional Application of Dissolution Provision
In a bill review letter concerning the legislation that created the Mid-Shore Regional Council and the Tri-County Council for the Lower Eastern Shore of Maryland, this Office raised the question whether the designation of the circuit court to dispose of residual agency assets would violate the State Constitution. The bill review letter explained:
The evident purpose of the latter provision is to provide a backup method of distribution of the funds of the Council in the event that the Council dissolves without disbursing the funds. However, to the extent that this provision would permit the court to simply decide the issue and disburse the funds without a case before it, it is our view that it places a nonjudicial duty on the courts, in violation of Article 8 of the Maryland Declaration of Rights.
Article 8 of the Maryland Declaration of Rights provides "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other, and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." It has long been established that this provision prevents the General Assembly from assigning nonjudicial functions to the courts.. . . There is no precise definition of judicial function. However, certain principles have been established.
First, it is generally recognized that the courts cannot be given decision-making authority in the absence of a case brought before it as a controversy between parties. . . . In addition, it is generally recognized that decisions that are based on policy, rather than on the facts and the law, are not judicial. .. . .
The decision of whether funds remaining after the dissolution should be used for some specific purpose that will further the purposes of the councils, or whether it should be returned to the individual counties, is one that involves policy decisions rather than simply facts. Moreover, the bills appear to contemplate that the decision will be made by the court without the necessity of a suit being brought before it. It is our view that simply assigning this decision to the circuit court violates separation of powers. However, it is our view that the circuit court could resolve the issue if the interested parties were to bring an interpleader action before it, and to that extent, the provision may be given effect.
Letter of Attorney General J. Joseph Curran, Jr. to Governor Parris N. Glendening concerning House Bill 1088, House Bill 1087 and Senate Bill 889 (May 14, 2001) (citations omitted). That advice was reiterated in a subsequent bill review letter concerning the legislation that created the Upper Shore Regional Council. Letter of Attorney General J. Joseph Curran, Jr. to Governor Robert L. Ehrlich, Jr. concerning Senate Bill 525 and House Bill 662 (April 18, 2003).
II
Analysis
A. Origin of the Dissolution Provision
The dissolution provisions appear to be patterned after an Internal Revenue Service ("IRS") regulation governing entities exempt from federal income taxation under 26 U.S.C. § 501(c)(3). That exemption applies to organizations that support religious, charitable, educational, literary, or scientific work, prevention of cruelty to children and animals, and testing for public safety. An important condition of the exemption is that the entity be organized exclusively for one or more of those purposes. An IRS regulation relates that condition to the disposition of the entity's assets upon its dissolution:
. . . An organization's assets will be considered dedicated to an exempt purpose, for example, if, upon dissolution, such assets would, by reason of a provision in the organization's articles or by operation of law, be distributed for one or more exempt purposes, or to the Federal government, or to a State or local government, for a public purpose, or would be distributed by a court to another organization to be used in such manner as in the judgment of the court will best accomplish the general purposes for which the dissolved organization was organized.. . .
26 CFR § 1.501(c)(3)-1. The Maryland corporation law establishes similar requirements for the disposition of assets held for charitable purposes of nonstock corporations. See Annotated Code of Maryland, Corporations Associations Article ("CA"), §§ 5-208(b)(3).[3]
The regulation's mention of court involvement in the distribution of a non-profit organization's assets is likely a reference to the judicial power of cy pres, available when a charitable or religious corporation is dissolved. See CA § 5-209.[4]
The available legislative history confirms that the dissolution provisions are ultimately derived from the IRS regulation. It appears that a dissolution provision was first added to the statute for the oldest of the regional councils in order to ensure that private contributions to the council would be tax deductible. This occurred in 1982, when the General Assembly amended the statute governing the Tri-County Council of Southern Maryland. Chapter 726, Laws of Maryland 1982.[5] The legislative file contains a bill request form, submitted to the bill drafter for that legislation, which indicates that the purpose of adding the "dissolution clause" was to ensure that contributions to the Council would be tax deductible. The enabling legislation for the other agencies, enacted in later years, was apparently patterned after the legislation for that Council and, as a result, included similar dissolution provisions.[6]
Even if compliance with the IRS § 501(c)(3) regulations were desirable,[7] the inclusion of the dissolution provision in these statutes was likely unnecessary to achieve that purpose. There would be no need to direct distribution of agency assets to other § 501(c)(3) organizations upon the demise of the agency in order to achieve that end. Under the IRS regulation quoted above, the assets of an entity are considered "dedicated" to an exempt purpose if they would be distributed to a state or local government for a public purpose, upon dissolution of the entity. Thus, even if an agency's assets reverted to the federal government, the State, or the counties in that manner the IRS regulation would be satisfied.
B. Effectiveness and Construction of Dissolution Provision
Although some of the regional development agencies existed in some form prior to their recognition by the Legislature, they are now all codified in statute by the General Assembly. As public corporations, they each derive their authority from the State. Levin v. Sinai Hospital of Baltimore City, Inc., 186 Md. 174, 178,46 A.2d 298 (1946). No provision is made in any of the statutes for circumstances under which someone other than the General Assembly could dissolve one of these agencies. Of course, if the State or pertinent counties failed to fund an agency or vacancies in the membership of its governing body were not filled by appointment, the organization could become dormant. However, none of these agencies could be "dissolved" without action by the General Assembly.
If the General Assembly chose to terminate the existence of one of these agencies, it could simply repeal the agency's enabling legislation, including provisions concerning the disposition of assets. It could then direct the disposition of those assets in some other fashion. If the Legislature repealed the enabling law and failed to specify any disposition, the assets would simply revert to the government in accordance with State law, unless a contingency in a grant required some other disposition — e.g., repayment to the grantor. See, e.g., SFP § 4-501 et seq. (disposition of excess and surplus property); SFP § 7-302 (unspent balance of an appropriation ordinarily reverts to State's general fund); see also 72 Opinions of the Attorney General 3 (1987).
While the dissolution provisions are ineffective by themselves and probably unnecessary, they are not without substance. In theory, the General Assembly could also terminate an agency, without repealing the enabling legislation, by simply adding a sunset provision to that legislation. In that case, the provision concerning disposition of assets would take effect on the termination date. For the reasons outlined in our bill review letters, we would construe the provisions concerning judicial disposition to take effect only in the context of an interpleader or other action that would properly invoke the jurisdiction of the court. Thus, although the dissolution provisions are now effectively dormant, in our view, their elimination would be a substantive revision of the statutes.[8]
Finally, you ask whether the dissolution provisions conflict with SFP § 7-302, which provides generally that the unspent balance of an appropriation reverts to the State's general fund. The general rule expressed in that statute is qualified by the phrase "except as otherwise provided by law" — an acknowledgment that the Legislature is free to specify an alternative disposition.[9] If the General Assembly were to terminate the existence of a regional council without repealing the dissolution provision, it would effectively direct an alternative disposition of the agency's residual assets under that provision.
III
Conclusion
For the reasons set forth above, it is our opinion that:
1. A regional development agency may not dissolve or otherwise be terminated without legislative action by the General Assembly.
2. A statutory provision requiring disposition of agency assets to § 501(c)(3) organizations can be given effect if the Legislature amends the agency's enabling law to set a termination date for the agency, but otherwise leaves that law, including the provision concerning disposition of agency assets, in effect. Of course, as part of its decision to terminate an agency, the General Assembly could also choose to dispose of its assets in some other way. In our opinion, the provision concerning disposition of the agency's assets to § 501(c)(3) organizations should not be repealed in a non-substantive revision of the code.
3. Although the part of the existing law that assigns to the circuit court the duty of distributing assets of a terminated agency raises a constitutional issue, that law can be construed in a constitutional manner to provide for judicial disposition of the assets, if the court's jurisdiction is invoked through an interpleader or other appropriate action. Accordingly, that provision should not be repealed in a nonsubstantive revision of the code.
4. While SFP § 7-302 states a general rule that unspent agency appropriations revert to the State's general fund, the General Assembly may specify other dispositions of State funds by statute. The disposition of some funds held by regional development agencies may also be subject to conditions set by a grantor, such as the federal government.
J. Joseph Curran, Jr. Attorney General
Robert N. McDonald Chief Counsel Opinions Advice
[1] The Tri-County Council for Southern Maryland receives State financial support through appropriations in the State budget for the Department of Business and Economic Development ("DBED"). Article 20, § 2-403(a). In addition, the Council is to receive specified funding from the three counties in its region, and may receive additional financing from those sources. Article 20, § 2-403(b).
The Tri-County Council for Western Maryland is to receive annual funding by appropriation through DBED in the State budget that matches the contributions of the participating counties. Article 20A, § 2-205(a). Additional funds may be appropriated for the Council by the counties or other political subdivisions in the region. Article 20A, § 2-205(b).
The Tri-County Council for the Lower Eastern Shore of Maryland and the Mid-Shore Regional Council are each to receive at least $200,000 in funding through DBED in the State budget and at least $10,000 from each of the three counties in their respective regions. Article 20B, § 2-301; Article 20C, § 2-301. The Upper Shore Regional Council also may receive State funding through DBED, as well as a minimum of $10,000 from each county in its region. Article 20D, § 2-301.
[2] The statute governing the disposition of the assets of the Rural Maryland Council contains a proviso that is absent from the statutes for the other agencies. It states that the specifications for disposition of the Council's assets do not apply to "the disposition of any funds or other assets of the State." Article 41, § 15-110(a)(2).
[3] Maryland corporation law provides that, upon dissolution of a nonstock corporation:
Assets held by the corporation subject to limitations permitting their use only for charitable, religious, eleemosynary, benevolent, educational, or similar purposes, but not held subject to legally valid requirements for their return, transfer, or conveyance by reason of dissolution or forfeiture, shall be transferred or conveyed under a plan of distribution . . . to one or more Maryland or foreign corporations or associations having a similar or analogous character or purpose, or associated or connected with the corporation.
CA § 5-208(b)(3).
[4] The cy pres doctrine derives from the jurisdiction of courts of equity over charitable trusts. See Wilner, The Cy Press Doctrine Explored, 22 Md. L.Rev. 340, 341 (1962); see also Annotated Code of Maryland, Estates Trusts Article, § 14-302.
[5] The Tri-County Council for Southern Maryland was formed in the mid-1960s, recognized by executive order in 1965, and formally established by legislation in 1966. See Chapter 586, Preamble, Laws of Maryland 1966. It became a tax-exempt public corporation in 1970 and was recognized as an independent agency in 1984. See Chapter 573, Laws of Maryland 1970; Chapter 373, Laws of Maryland 1984.
[6] The Tri-County Council of Western Maryland traces its origins to the Governor's Council for Appalachian Maryland created in 1968, which was replaced in 1971 by a non-profit corporation, renamed the Tri-County Council for Western Maryland, and certified by the Governor as the local development district eligible to receive federal funds under the Appalachian Regional Development Act of 1965. Enabling legislation was enacted in 1986 to make it an independent agency. Chapter 861, Preamble, Laws of Maryland 1986.
The other three regional councils and the Rural Maryland Council are all of relatively recent origin. Chapter 100, Laws of Maryland 2003 (Upper Shore Regional Council); Chapter 528, Laws of Maryland 2001 (Mid-Shore Regional Council); Chapter 527, Laws of Maryland 2001 (Tri-County Council for the Lower Eastern Shore of Maryland); Chapter 119, Laws of Maryland 1995 (Forvm for Rural Maryland, later renamed Rural Council of Maryland).
[7] Given that the councils are units of government charged with a public purpose, compliance with the § 501(c)(3) regulations may have been unnecessary. See 26 U.S.C. § 170(c)(1) (defining "charitable contribution" to include gifts to a state or political subdivision for exclusively public purposes). We understand that only one of the councils has actually applied to the IRS for § 501(c)(3) status.
[8] While unusual, it is not unprecedented for the General Assembly to enact a law that requires further legislative action to become effective. For example, legislation that creates a new program or agency may remain dormant until the Legislature takes action to fund that initiative.
[9] We need not analyze the extent to which the assets of the regional councils consist of "moneys of the State." See 76 Opinions of the Attorney General 59 (1991); 71 Opinions of the Attorney General 10 (1986).
 *Page 3